IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                  Plaintiff,

vs.

JACOB BLANKENHEIM,

                  Defendant.

                                 Case No. 20-cr-130-jdp

## DEFENDANT'S SENTENCING MEMORANDUM

### I.    HISTORY OF THE OFFENSE.

Mr. Blankenheim had been using computer software named "Gigatribe" to exchange photos, videos, and unfortunately, child pornography, with others.

Several times a month, a Swiss undercover agent posted his email on a website, IMGSRC, which is an image sharing internet site used mostly in Eastern Europe. It appears, according to documents filed previously, that the undercover agent connected through Gigatribe with someone whose screen name is stephezf939393 in February, 2019. The agent immediately asked for his password. Apparently, stephezf939393 and he communicated about sharing passwords. The undercover agent told him that he had been online for "5 years" and all he sees from stephezf939393 is 40 pictures that are found on google. They were not child pornography. Nothing happened in February.

1

In August, the parties again began to banter back and forth on Gigatribe and the undercover agent again chided stephezf939393 that he only shared 12 pictures found on google, none of which were child pornography. The agent continued to denigrate stephezf939393 by arguing that he had nothing to share. The agent indicated that the agent shared mostly "pthc" stuff.[1] The undercover agent then rebuked stephezf939393 that he was still looking for stuff without sharing. Shortly thereafter, six images were allegedly sent by stephezf939393 to the undercover agent.[2]

On August 15, 2019, after the documents were received by the Swiss undercover agent, he in turn disseminated the information on a disc to the FBI wherein he claimed six files from a folder downloaded from stephezf939393 with an IP address of 97.88.42.72 contained images classified as child pornography. Mr. Blankenheim was linked to the screen name stephezf939393.

After a Search Warrant was executed, approximately 2,800 images and videos were found on Mr. Blankenheim's electronic devices. He told agents who interviewed him at the time of the search warrant execution that he did not know that those images still existed on his electronic devices, but he had downloaded child pornography in the past. When he did so, he owned a Sony VAIO computer. He bought a Western Digital external hard drive to back up his computer. While he did not intentionally back up the child pornography, the external hard drive did that automatically. Eventually, that external hard drive ran out of space to store material. Mr. Blankenheim then bought

---

[1]That is a known term used to search for or distribute child pornography.

[2]There was a suppression motion filed concerning whether stephezf939393 could have been the source of that distribution which is the subject matter of a preserved potential appeal.

a Maxtor external hard drive, which allowed for twice as much storage.  He then backed up everything on the Western Digital hard drive and believed that there were some child pornography contained therein.  However, he thought he would go back and delete it all later. He never did so.

When the Search Warrant was executed in February 2020, Mr. Blankenheim was confronted by the investigators. He admitted to being the only person with access to his electronic devices and that he used Gigatribe with stephezf939393 as his user profile. He admitted seeing child pornography on the Gigatribe, but he did not realize he had the images stored on his devices.[3]

He took a polygraph at the agent's request and he admitted that there was probably "a ton of material" on his devices.  He said he did not have any sexual interest in children. When he said that, he meant that he was not interested in hands on offenses with them.  He indicated he usually viewed the child pornography and then deleted the material.  He denied ever storing it on an external hard drive, thumb drive, or flash drive because he really didn't know he had done that.[4] He admitted that he had a lot of pornography on his devices and he began using chat rooms to discuss the sexual fantasies with other people online.  He admitted he had been viewing child pornography for more than 5 years.  He admitted that he viewed it multiple times per week.  He assumed there would be a lot of that material on his electronic devices.

While he did not pass the polygraph in relationship to sexual contact with children, the polygraph was not conducted with correct standard methodology.  Polygraphs are quirky and there are certain criteria  that should be followed before one is administered. To obtain an accurate

---

[3]This has been explained above.

[4]He had to be able to retrieve it somehow as he was able to share something with the Swiss undercover agent.

reading of the polygraph, it should be administered to a participant after the participant is well rested and has a full stomach. Mr. Blankenheim indicated that he felt extremely exhausted throughout the exam, found it hard to stay awake, and did not get any sleep prior to the agents arriving at his house with a Search Warrant. He was hungry as well. There is a reason polygraphs are not admissible in court. The important issue is that he sat down and cooperated as best he could with the agents when they confronted him.

## II.    HISTORY AND CHARACTER OF THE DEFENDANT.

Mr. Blankenheim has had steady employment since he graduated from high school. He worked for Plastic Ingenuity in Cross Plains for 30 years, making $26.00/hour as a machine technician and crew leader. He lost his job when he was arrested in this matter.[5] The letter from his supervisor, Ben Vreibel, explains what a gifted and valuable employee he was (Exhibit 1).

Mr. Blankenheim's father left him when he was young. He did not have much of a relationship with him. He lived with his mother and his father figure role model was his grandfather.

Mr. Blankenheim lives with his mother as she has been battling cancer for the last four years. He takes care of her and is her support. In her letter to the court, she explains that he is a wonderful son and a better person despite a lifelong battle with depression (Exhibit 2). He was married to Melissa Burrow in 2002, and they finally divorced in 2018. They had separated for 12 years before the divorce. She had a number of OWI convictions and, in fact, went to prison. Mr. Blankenheim explains his ex-wife was verbally and physically abusive to him. She went to jail and eventually prison because of her alcohol addiction.

---

[5] This is partially because he sat in jail for approximately 16 days in which no court activity occurred, and he had not contacted any lawyer.

4

Mr. Blankenheim does not drink, smoke, or use controlled substances. He does have mental health issues as he has suffered from depression since approximately age 15. Part of his supervised release should include some mental health counseling, although he has been going to mental health and sex offender treatment since September 10, 2021, when it was ordered by Pretrial Services.[6]

There are a number of letters attached hereto from people who know him well. All indicate that he has been a mentor and good friend. He is a kind man who is tireless in helping see the best in people and lifting them up when they slip or stumble. He does not cause trouble and is always there to help a friend (Exhibit 3).

Janel Kruchten is Mr. Blankenheim's cousin. She indicates that the charge does not define Mr. Blankenheim as a person. He is thoughtful, respectful, and someone who has lived life by the rules. He has no prior record (Exhibit 4).

Mr. Blankenheim was engaged to be married to Marissa Deibert. It appears that this is either on hold or going to fizzle because Mr. Blankenheim is going to prison.

As a result of this crime, Mr. Blankenheim has lost his job, which was his career, his fiancé, and the ability to care for his mother who is ill. Other than this charge nobody has anything negative to say about him.

---

[6]We have seen no records from this treatment.

### III.    SENTENCING GUIDELINES.

The sentencing guideline as calculated by the U.S. Probation Officer is accurate except as stated in Defendant's objection to the presentence report(Docket 55)[7].  However, for a variety of reasons, the defendant believes that these guidelines are skewed.  Almost all of the enhancements apply to every child pornography case that is prosecuted.  Attached hereto as Exhibit 5 is a summary of testimony of witnesses who appeared before the United States Sentencing Commission at a public hearing on federal child pornography crimes.  This commission met to address how Congress, sentencing judges and Federal Sentencing Guidelines can appropriately distinguish between less and more serious offenders (Exhibit 5, p. D-3).  At that time, it was difficult to do so.  According to Gerald Grant, a digital forensic investigator for the Office of the Federal Public Defender, a person could type in the word "sex" as a search term, grab all their files, leave, and be pretty certain that search is going to hit every one of the sentencing enhancements within a short period of time based on high speed technology, instant availability and simple key word searches that do not even indicate ones pornography preference (Exhibit 5, p. D-3).

Susan Howley was the chairperson for the Victims Advisory Group to the U.S. Sentencing Commission.  She said the advent of the internet no longer connotes the same intentionality that it once did when images were traded through the mail.  Therefore, other factors are important, such as the number of times the images were collected, the span of time over which

---

[7]The AUSA agrees with Mr. Blankenheim's objection that an enhancement pursuant to 2G2.2(b)(3)(B) does not apply.

the images were collected, the extent to which the images were cataloged, and anything that indicates an offender's real intentionality and involvement with the large collection of images (Exhibit 5, p. D-20).[8]

In 2012, the Honorable Casey Rodgers, Chief Judge for the United States District Court for the Northern District of Florida, indicated that an overwhelming percentage of district judges were dissatisfied with the Guidelines, particularly in the area of possession and receipt. She indicated that the multiple large-level offense characteristic enhancements in Section 2G2.2 have been applied too frequently, and they fail to distinguish harmful conduct (Exhibit 5, p. D-22). This guideline is completely at odds with the Sentencing Reform Act. That act requires judges to consider other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. That is impossible to do under Section 2G2.2, which in many cases completely removes criminal history from the sentencing equation. Id. In 2012, 90% of defendants received two levels for use of a computer under 2G2.2(b)(6). In 100% of the receipt cases and 46% of the possession cases, two levels for material involving a prepubescent child were applied under 2G2.2(b)(2). In 80% of the receipt cases and 61% of the possession cases, four levels were applied for sadistic, masochistic or violent conduct pursuant to 2G2.2(b)(4). In more than 80% of the receipt cases, a five-level increase for over 600 images was applied under 2G2.2(b)(7)(C). She believed that the impact of those four offense characteristics, which apply in the majority of these cases, creates a serious imbalance unlike anything else in the Sentencing Guidelines. Between 2004 and 2011 in

---

[8] Mr. Blankenheim possessed less than the median number of 4,265 images for non-production child pornography offenders (Exhibit 2) and the images were not catalogued.

her district, not one person charged or convicted of receipt had a guideline range that included the mandatory minimum. All began well above it. These unwanted sentencing disparities not only frustrate judges, but they erode the public's confidence in the fair administration of justice (Exhibit 5, p. D-23). She stressed that it is not appropriate to lump everyone together and assume that everyone charged with a sex offense poses the same level of risk (Exhibit 5, pp. D-24 and D-25).

On June 29, 2021, the United States Sentencing Commission updated its report to Congress from 2012 on federal child pornography offenses (Exhibit 6). Statistics from 2019 showed 99.4 percent of the cases involved prepubescent victims which, if the child is under 12, adds two levels to the sentencing guidelines under 2G2.2(b)(2). The median number of images per case was 4,265. Four of the six enhancements in 2G2.2 apply to the vast majority of cases resulting in 13 additional offense levels in calculating the guidelines. 95 percent of the nonproduction child pornography offenders received enhancements for the use of computer (two levels) and images depicting children under 12 (two levels). 84 percent of the cases involved sadistic, masochistic or abuse of an infant or toddler, and 77 percent involved 600 or more images. From 2005 to 2019, the average guideline minimum for nonproduction child pornography offenders increased from 98 months to 136 months. 59 percent of the nonproduction child pornography offenders received a variance below the guideline range.

While we believe the Presentence writer has calculated the Sentencing Guidelines correctly in this case except as stated above, it does not mean we agree that the Sentencing Guidelines are appropriate to consider when sentencing a defendant in all child pornography cases.

## IV.   18 U.S.C. § 3553 FACTORS.

### A.   The Seriousness of the Offense.

Child pornography is a serious and horrific crime, United States v. Robinson, 669 F.3d 767, 776 (6th Cir. 2012), because it harms and debases the most defenseless of our citizens. United States v. Williams, 553 U.S. 285, 307 (2008). It takes the humanity out of victims. Child pornography offenses result in perpetual harm to victims and validate and normalize the sexual exploitation of children (Exhibit 6, United States Sentencing Commission Child Pornography Report). In the instant case, Mr. Blankenheim viewed and exchanged a number of images of child pornography with his personal electronic devices. The images depicted sexual exploitation of minors.

Unfortunately, defendants engaged in nonproduction child pornography cases, the nature and circumstances of Mr. Blankenheim's conduct, are sadly routine. This Court should evaluate the seriousness of his conduct in light of the Sentencing Commission's conclusion that the current sentencing scheme results in overly severe guideline ranges for some offenders based on outdated and disproportionate enhancements related to their collecting behavior (Exhibit 6, p.2).

Advancements in technologies and the evolution of the child pornography market have led to a significantly changed landscape, one that is no longer adequately represented by the existing sentencing guidelines. The existing specific offense characteristics in USSG § 2G2.2 may not accurately reflect the seriousness of Mr. Blankenheim's conduct and fairly account for differing degrees of offender dangerousness. At times the current guidelines can under-represent and at other times over-represent the seriousness of an offender's conduct and the danger he poses. Several of the provisions in the current Sentencing Guidelines for nonproduction offenses, in particular the

9

existing enhancements for the nature and volume of the images possessed, i.e., an offender's use of

a computer and distribution of images, originally were promulgated in an earlier technological era.

Most of these enhancements were promulgated when offenders typically received and distributed

child pornography in printed form using the United States mail.  The enhancements were intended

to apply only to certain offenders who committed aggravated child pornography offenses and are

now being applied routinely to most offenders.

In evaluating the seriousness of Mr. Blankenheim's offense, this Court should

examine the following:

1.  How did he obtain the child pornography?

2.  The volume and type of child pornography he collected.

3.  How long has he been collecting child pornography?

4.  The attention and care he gives to his collection.

5.  How he uses his collection once obtained.

6.  How he protected himself and his collection from detection.

7.  Whether he created, facilitated or participated in a community centered on

child exploitation.[9]

In reviewing these factors as applied to Mr. Blankenheim, it appears that he obtained

his child pornography mostly from Gigatribe.  While it appears he had been viewing child

pornography for a significant amount of time, he believed he deleted most of the images when he

was done viewing them.  He viewed other legal pornography in addition to child pornography.  It

---

[9]While he used Gigatribe to exchange child pornography, he did not produce it, categorize
it, or attempt to hide it with a VPN.

does not appear that he organized or placed the images into particular folders so that he could view them later. He did not delete it all. However, he did not have a VPN or any other device that was capable of blocking detection of the material. The size of his collection, according to the Presentence writer at ¶ 17 and ¶ 22, was that he possessed 3,200+ images. According to Exhibit 6 attached hereto, the average number of images per child pornography conviction in this country is 4,265 images. Further, the type of images at issue in this case are, sadly to say, routine. While the offense in question is serious, the enhancements applied to Mr. Blankenheim in this case yield a sentence that is greater than necessary to achieve § 3553(a)'s purposes.

        B.     Deterrence.

        For the most part, people viewing child pornography have a sexual addiction that is not easily treatable and not easily deterred. The logic of general deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it, and so more will be produced. Affording adequate deterrence is also closely linked to reflecting the seriousness of the offense. Therefore, the Court should consider this in rendering its sentence. However, based on the undersigned's experience, who has dealt with at least 25 child pornography cases in both state and federal courts, many if not all of the child pornography viewers know that their conduct is illegal, but do not appreciate the harm it causes and the magnitude of it of the problem.[10]

---

[10] This is a general deterrence issue, but the undersigned believes general deterrence is a minimal factor to consider because it does not work.

The Court can accomplish specific deterrence by placing restrictions on access to online material and other conditions of supervised release. Mr. Blankenheim will be subject to the Sex Offender Registration and Notification Act, which will impose additional restrictions on him. See 42 U.S.C. § 16901 et seq. Mr. Blankenheim has faithfully attended therapy ordered by Pretrial Services. We do not have any records from the facility where he has been treating as required by Pretrial Services; however, it appears that he has done well. Mr. Blankenheim is a good candidate for rehabilitation, further reducing the likelihood of him committing future crimes. While Mr. Blankenheim realizes he needs to be punished for what he has done, in essence the rehabilitation started when he was first confronted in February 2020. Since that time, Mr. Blankenheim has followed his rules of supervision.

## V.   **SENTENCING DISPARITIES.**

Mr. Blankenheim is subject to the five-year minimum mandatory prison sentence because he distributed child pornography. A sentence of incarceration is consistent with Congress' retributive judgment that child pornography offenses are reprehensible. Further, a term of imprisonment will serve Congress' established interests in the general deterrence of child pornography offenses. However, based on his minimal criminal history, his struggles with mental health issues such as anxiety and depression, and his amenability to rehabilitation, we believe that the Guidelines should not be used to calculate his sentence in this matter. A term of five years imprisonment followed by five years of supervised release after his prison sentence is sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. See 18 U.S.C. § 3553(a)(2)(A).

## VI.    **RESTITUTION.**

Pursuant to 18 U.S.C. § 2259, the Court shall order restitution in any case involving child pornography. The Court shall determine the full amount of the victim's losses that were incurred or are reasonably projected to be incurred as a result of the trafficking in child pornography depicting the victim. 18 U.S.C. § 2259(b)(2)(A). The Court is then to determine the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000. 18 U.S.C. § 2259(b)(2)(B). Once a victim's total aggregate recovery exceeds the full amount of his or her demonstrated losses, the liability of each defendant who has been ordered to pay restitution shall be terminated. 18 U.S.C. § 2259(b)(2)(C).

Case law indicates that an award of restitution under the statute can account for the defendant's contribution to the continuing and grievous harm of reproducing, distributing or possessing child pornography depicting the victim. United States v. Beckman, 786 F.3d 672, 682 (8th Cir. 2015). However a defendant generally cannot cause harm prior to the date of his offense United States v. Thomas, 932 F.3d 1139, 1141 (8th Cir. 2019), citing U.S. v Gamble 709 F3d. 541, 544(6th Cir. 2013).

Approximately 30 people submitted victim impact statements but only two provided any documentation concerning expenses incurred or expected to be incurred from the abuse. None provided any information as to the amounts received so far or when or what expenses have been incurred. This Court should order restitution in an amount that comports to Mr. Blankenheim's relative role in the process underlying these children's losses. He should be held accountable for the impact of his conduct on these children, and not for the conduct of others. Paroline v. United States, 572 U.S. 434, 458, 459 (2014).

13

The Court should assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses. This is not a precise mathematical inquiry and involves the use of discretion and sound judgment. Under 18 U.S.C. § 3664(a), a Court may exercise discretion in fashioning a restitution order. A District Court is expressly authorized to conduct an inquiry where multiple defendants have contributed to the loss of a victim before it. See 18 U.S.C. § 3664(h). The amount of loss for each child has not been determined as of yet.

The undersigned previously had a case where the Sweet Sugar victim requested restitution. There the undersigned spoke with the attorney for those victims. The attorney, Deborah Bianco, informed the undersigned that Pia[11] had received $261,046.89 as of November, 2019. This becomes relevant only to determine whether her expenses have been paid in full. Attorney Bianco has represented this person since 2016, and Pia's total expenses appeared to be $91,900 in November 2019. According to Attorney Bianco, she has already received in excess of her expenses. Therefore, it appears that her restitution has been paid in full. This Court needs to make similar findings on each of the victims requesting restitution in this matter.[12]

VII.     **CONCLUSION.**

Child pornography has lasting impact on victims. Victims live in constant fear that their images will surface and be viewed by their family or people they know. They feel guilt and shame that the images have been circulated, compounded by the belief that people might think they were willing participants. The abuse memorialized by the recording of their vulnerability as minors

---

[11]Pia submitted a victim impact statement in this case.

[12]See PSR paragraph 31.

may be set in time, but its crippling effects are in many ways perpetual or lifelong.   Child pornography is a permanent record of that abuse, thereafter exacerbated by its circulation.

Offenders view the plot of their aberrant entertainment, forgetting or callously ignoring that these are real children being subjected to real and horrific abuse.  They have suffered real harm then, and they continue to suffer it.  Mr. Blankenheim acknowledges that all of that is true.

Based upon all of the factors enunciated in the Presentence Report and this memorandum, the defendant respectfully requests the Court sentence him to a term of imprisonment of 60 months.

Dated this 20th day of July, 2022.

EISENBERG LAW OFFICES, S.C.

/s/ Mark A. Eisenberg
Mark A. Eisenberg
State Bar Number:  01013078
308 E. Washington Avenue
P. O. Box 1069
Madison, WI  53701-1069
Telephone:  (608) 256-8356
Fax:  (608) 256-2875
E-mail: mark@eisenberglaw.org
Attorneys for Defendant, Jacob Blankenheim

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Taylor L. Kraus, Assistant United States Attorney
Mariah A. Stieve, U.S. Probation Officer

/s/ Mark A. Eisenberg
Mark A. Eisenberg

15