# EXHIBIT 5

# APPENDIX D
# SUMMARIES OF THE TESTIMONY OF THE WITNESSES
# UNITED STATES SENTENCING COMMISSION
# PUBLIC HEARING ON FEDERAL CHILD PORNOGRAPHY CRIMES
# WEDNESDAY, FEBRUARY 15, 2012
# 8:15 A.M.–5:30 P.M.
# WASHINGTON, DC

## I.   Offender Use of Technology

**United States Department of Justice**
*James Fottrell, Child Exploitation and Obscenity Section, Criminal Division*

Mr. Fottrell observed that "[a]s new technologies emerge, offenders are often among the early adopters of those technologies to further their activities," and provided a brief background annotating the procedures and policies for examining and analyzing digital evidence. (TR 17–18). He stated that once exact-image copies are made of the digital media seized, its analysis "helps investigators and prosecutors answer some of the critical questions of the offense, including who did it, when did it happen, where did it come from, how did it get here, and what technologies were used to commit the offense," and that finding the answers to such questions "is like assembling the pieces of a puzzle in order to form a clear picture of the offense conduct." (TR 18).

Mr. Fottrell provided a number of examples of the kind of information that can be obtained during a computer forensics exam, and said that "[t]he analysis of [the obtained and copied] digital media can help provide evidence of the charged conduct, including providing critical evidence of the knowledge and intent to collect child pornography," as such information may be gleaned by examining the patterns of web browsing activity to determine who was using the computer at or around the time that illegal activity took place. (TR 19–20). Additionally, he described how a Thumbs.db file, Link Files, and the Windows Registry, provide specific date and time information about when a file was accessed or when images and/or videos were viewed by a computer user, all of which can help prosecutors "establish specific dates of knowingly possessing certain images and videos." (TR 20–22). Mr. Fottrell also explained how, in many investigations, offenders have large collections of images and videos, and stated that the folder names and the structure of the filing, "often contain useful insight into exactly the type of images that are most revered." (TR 22). Furthermore, he stated, that "[i]mages in particular folders sorted and organized [ . . . ] are not accidentally viewed; they are purposely sorted and organized in a particular manner." (TR 22–23).

In discussing the important question of being able to identify from where particular images and videos originated, Mr. Fottrell noted that while using computers and the Internet to access websites and e-mail are two technologies that may help to address the aforementioned question, "there are many other technologies used on the Internet every day," and many "different ways to classify and organize the types of different technologies used in online activity" such as by "identifying the different socialization aspects of the activity." (TR 23).

Mr. Fottrell explained how offenders may progress from an "individual experience" to an experience with much more group interaction. In the former, one acting alone receives, collects, and shares material online, he said, perhaps by registering for a child pornography website, receiving an e-mail with a user name and password, and possibly having limited communication abilities with the website administrator. (TR 23, 25–26). Next, an offender may increase his interactions with others by utilizing a "peer-to-peer" software program, often downloaded for free, and used to search for files using terms ranging from the very generic, such as "young," to the very specific, such as a particular series, victim name, website, or very narrow age range. (TR 26). One may then establish a unique online identity, used to communicate with other offenders via technologies such as "GigaTribe, instant messaging, newsgroups, and e-mail" in order to seek out more specific material. (TR 23–24). Such interactions, Mr. Fottrell claimed, helps offenders to "refine their desire for more specific material, while helping to validate their behavior among like-minded peers." (TR 24). Notably, Mr. Fottrell said that all of these technologies not only allow the exchange of images and video, but also provide a "conduit for direct communication [which] allows frank discussion of preference and specific types of material in helping individuals establish their unique identity." (TR 27). The next step in the progression, according to Mr. Fottrell, is to join an online community, which uses technologies such as "bulletin boards, social networking sites, and Internet-related chat." (TR 24, 27). Such groups often have specific rules and guidelines for membership, are sorted and organized into hierarchies to "distinguish the more experienced and senior members from the newer members," and work to "make sure that members employ sophisticated techniques to evade detection by law enforcement and deploy encryption to thwart the discovery of illegal material." (TR 24–25, 28). Such divisions, Mr. Fottrell said, "help law enforcement investigate and target and focus their investigations on the most serious offenders in the group." (TR 28–29).

Mr. Fottrell concluded by stating that "offenders use multiple Internet technologies to commit offenses online, and the type of evidence available to investigators and prosecutors varies depending on those technologies. [ . . . ] [I]n most cases, there is additional evidence located on computer servers on the Internet, separate from the offender's residence [and] [a]s investigators combine this evidence, they get a more complete picture of the offender's conduct." (TR 29–30).

### Office of the Federal Public Defender
#### *Gerald R. Grant, Digital Forensics Investigator*

Mr. Grant believed that the advancements in technology are a very important area to be aware of while trying to understand how the child pornography guidelines and enhancements apply. (TR 30). Noting that while contraband material typically comes in two categories: still pictures and movies, he said that there is a transition taking place "from the original still picture, which was a physical copy of a picture you can hold, to what's now becoming digital — nothing more than ones and zeroes on a computer." (TR 30–31). Because of such increasing technology, according to Mr. Grant, an individual can instantly take pictures and videos and upload them to the Internet via social networking sites, and send them to others via e-mail. (TR 32). This is important, he said, because it means that "we can get more instantly," that uploading and/or downloading pictures is no longer "a slow, painful process," and that access and use of program such as AOL Instant Messaging, Yahoo, and MSN, became simpler. (TR 33–34).

Detailing the progression of access to child pornography, Mr. Grant described how individuals used to develop film on their own, or use polaroid type film, and then mail photos to others via the post office. (TR 33). With the advent of the Internet, he said, people could then e-mail each other small photos, or exchange them via private chat. (TR 34–36). Then, when search engines became available, individuals were able to quickly find anything they wanted on the Internet. (TR 36). "Internet Relay Chat," Mr. Grant said, was the beginning of what is now referred to as "peer-to-peer," which he sees as the "primary vehicle" in child pornography cases today. (TR 36). He explained how such systems have evolved over time, from there being a centralized area, to systems without centralized areas but where sharing files was required, to being able to share partial files, or "swarm." (TR 37–41). When files are shared on such a large basis, he said, the file names become longer and longer, and it becomes hard to know what the file actually contains. (TR 42–43). Plus, Mr. Grant said, an individual can create a search, glance at the resulting file list, tell the program to download, and then just walk away. As such, he claimed, one can start up a program, "type in the word 'sex,' grab all [their] files, go to lunch, come back, and [be] pretty certain [he is] going to hit every one of the sentencing enhancements within that short period of time based on high-speed technology, instant availability, and simple keyword searches that don't even indicate what [his] preference is." (TR 43).

In addition to discussing means of access to child pornography, Mr. Grant discussed the availability of identity protection tools that he said are often automatic and computer cleaning software as things that may affect an investigation. (TR 44–47). Finally, he noted that the Adam Walsh Act has made it "extremely difficult for the defense," in that while they may be able to get access to the forensic analysis of their client's computer, they do not have the ability to do a full forensics examination themselves. (TR 47).

## Professor Brian Levine, Ph.D.
### *Department of Computer Science, University of Massachusetts Amherst*

Dr. Levine addressed the question of how Congress, sentencing judges, and federal sentencing guidelines can "appropriately distinguish between less and more serious offenders" from his view of technology and hoped that the Commission would place his statements in the context of other witnesses speaking. (TR 48–49). Noting that offenders can be distinguished, in part, "by their online actions and the technology they use to access and share images of child exploitation on the Internet," Dr. Levine stated that he sees three critical modern aspects of this crime, its offenders, and the technology that supports it, which are not generally considered at this point in time. (TR 49).

First, Dr. Levine discussed "the value that offenders contribute to the online community that they leverage to acquire and share files containing images," construing the term "community" broadly to extend from users who never communicate and just trade data, to groups that trade and have detailed social relationships. (TR 49–50). He stated that the value of such communities can be determined by a few factors: (1) the number of peers involved; (2) the amount of content shared; (3) the amount of time devoted to the community; and (4) the resources, or bandwidth, contributed to meet the demands for the content, and that "[u]sers that have contributed a great deal of value to a community in these terms are more serious offenders, or can be viewed as more serious offenders." (TR 51–52). Further, Dr. Levine noted, while the quantity of images that an offender contributes to a community is a part of determining his value, it is not the only

thing to consider, nor sufficient to consider alone. Rather, value is added by "increasing the set of available files on the network," when sharing unique files, as well as making it "easier for others to get content," when sharing files over a long period of time. (TR 52–53).

Second, Dr. Levine explored "the nonpecuniary benefits that [offenders] receive [by participating in online communities.]" (TR 49). In some venues, he said, offenders will receive benefits and incentives for their participation and it is those offenders who take advantage of such benefits who are considered "more serious offenders." (TR 54). As examples, Dr. Levine said that benefits can range from improved network performance when offenders "friend" one another, to training and encouragement that may lead from file trading to contact offenses. (TR 54).

Third, Dr. Levine addressed "the masking mechanisms [offenders] may employ intentionally to evade investigation." (TR 49). He asserted that those who intentionally use various mechanisms to mask network addresses and other information as part of their crimes should be, or can be, viewed as "significantly more serious offenders," as they fully participate in communities, make content available, but then "stonewall[...] justice and thwart [...] investigators' abilities to put a stop to [the] communities and rescue exploited children in some cases." (TR 55). Stating that masking is different than encryption, Dr. Levine said that there are many ways to mask one's IP address, but also noted that just because one is masking his IP address, does not mean that he is doing anything illegal. Comparing a child pornography trafficker or trader who masked his IP address to a bank robber wearing a mask, Dr. Levine said that while the masking may not cause more harm directly, the robber can receive a sentencing enhancement. (TR 56).

## II.   Child Pornography Offending – Pathways, Community, Treatment

**Gene G. Abel, M.D.**
*Medical Director, Behavioral Medicine Institute*
*Founder and President, Abel Screening, Inc.*

Stating that it is important to understand why people want to look at child pornography, Dr. Abel said that he would focus on child pornography and its relationship to past sexual behavior, as well as talk about treating the abuser, screening those at risk for molesting children, and how abuse impacts boys and girls to "develop sexual interest in children." (TR 87–88).

In beginning to explore whether the use of child pornography is related to past child molestation, Dr. Abel presented information about four groups of individuals that he has studied: Group 1— looked at child pornography but did not go to meet a child; Group 2— did not look at child pornography but have gone to meet a child; Group 3 — both looked at child pornography and met a child; Group 4 — child molesters. (TR 95–96). The individuals were asked (1) if they were referred to the criminal justice system; and (2) if they were arrested for viewing child pornography. Of those referred for viewing child pornography or for soliciting children, Dr. Abel said, there was a smaller odds ratio for having actually molested a child — which he said "doesn't make sense." (TR 97). But he asserted, the odds ratio is explained by the fact that once an individual has been arrested for viewing child pornography or soliciting a child, he stops talking about the kind of behavior he has been involved in. When looking at Group 4 (those referred for having molested children), however, Dr. Abel asserted that it becomes clear that

child pornography images exist are going to look at only prepubescent images" because "when you have a child who is 14 or 15 whose images have been made, they are still children but they won't be counted as child pornography images because their bodies will not be discernible from those of adult women." (TR 314–15).

According to Dr. Cooper, "[o]ffenders who download, possess, and trade in child sexual abuse images with a certain typology such as sadistic imagery promote the further commission of these kinds of crimes against children." (TR 315). She noted that "[f]rom the perspective of mental health treatment for victims of sexual abuse images, research has shown that the majority of clinicians feel ill-prepared in order to provide appropriate therapeutic purposes and services for these children." (TR 316).

Dr. Cooper cites a UK study which helps explain why children often do not bring up or deny the fact they have been victimized by pornography: "I don't talk about this because the images make it look like I just let it happen; I don't talk about it because sometimes he made me smile; I don't talk about it because I was the recruiter for other kids in my school that he said for me to come and spend the night on a sleepover and then he sexually abused them; I don't talk about it because I had to have sexual contact with another child and it makes me feel worse . . . the offender said, 'You should have stopped this. It's your fault this all happened.'" (TR 317).

Dr. Cooper reminded the Commission that "most of the meta-analysis studies of recidivism have been based upon rearrest rates. When you recognize that children who have been sexually abused and pornographically photographed don't tell more than people who have been sexually abused without pornography, then you will understand that these are the types of children who are not going to make a disclosure." (TR 318). Dr. Cooper suggested that this "will be a major hindrance to rearrest rate[s]," and she thought "it will help us to have to think carefully about recidivism in child pornography victimization." (TR 318).

### Susan Howley
### *Chair, Victims Advisory Group to the U.S. Sentencing Commission*

Ms. Howley stated that "the proliferation of child abuse images increases the risk of future victimization and harms the victims who are the subject of those images." (TR 319). She explained that "it increases the risk of victimization because repeated exposure to those images normalizes the sexual assault of children, promoting cognitive distortions." (TR 319–20). Based on a meta-analysis of published research on the effects of pornography, Ms. Howley suggested that "clear and consistent exposure to pornographic material puts one at an increased risk for developing sexually deviant tendencies, committing sexual offenses, experiencing difficulties in one's intimate relationships, and accepting the rape myth." (TR 320). She stated that "those who collect such images also increase the demand for additional images, raising the risk of future victimization." (TR 320). Additionally, she noted that "child sexual abuse images are often used to groom future victims in an attempt to persuade them that such acts are normal and pleasurable." (TR 320).

Ms. Howley stated that "each of these victims who is depicted suffers the harms normally associated with being a victim of sexual abuse." (TR 320). She referred to the framework proposed by Doctors David Finkelhor and Angela Browne, who identified four traumagenic

dynamics that link child sexual abuse to psychological injury: traumatic sexualization; betrayal; stigmatization; and powerlessness. (TR 321). Ms. Howley defined traumagenic sexualization as "a process in which a child's sexuality, including both sexual feelings and sexual attitudes, is shaped in a developmentally inappropriate and interpersonally dysfunctional fashion as a result of sexual abuse." (TR 321). She explained that betrayal "refers to the child's discovery that someone on whom he or she depended has harmed, lied to, used, manipulated, or blamed the victim." (TR 322). Ms. Howley noted that powerlessness "results from the repeated violation of a child's body or personal space and the inability to stop the abuse. It increases when children are unable to get help from other adults." (TR 322). She defined stigmatization as "the shame, guilt, and negative self-image resulting from the abuse." (TR 322). Ms. Howley noted that stigmatization "increases when others react with shock or hysteria after the abuse is revealed, or when they blame the victim or impute other negative characteristics to the victim." (TR 322). She suggested that this "framework for thinking about the harm caused by sexual abuse helps to explain the resulting anxiety, depression, lack of self-worth, increased risk for suicide and substance abuse, sexual dysfunction, and other consequences." (TR 323).

Ms. Howley claimed that "victims of child sexual abuse imagery suffer all those consequences and, in addition, they suffer new layers of impact." (TR 323). For example, she stated that "perpetrators may use images of the child to perpetuate the crime by maintaining the child's continued cooperation by threatening to reveal the images to parents or others, reinforcing that stigmatization and powerlessness that comes from the original abuse." (TR 323). Ms. Howley suggested that "[w]hen victims learn that the offender not only sexually abused them but then benefitted with the distribution of images of that abuse, whether financially or through increased status . . . this can compound that sense of betrayal that they already suffered as a result of the abuse." (TR 323). Additionally, she stated that the nature of the Internet and the permanence of the image can lead victims to live in fear that any person they interact with may have seen the images, and this "realization can intensify the victim's feelings of stigmatization that they already had from the original abuse." (TR 324).

Ms. Howley stated that victims "may be further sexually traumatized by realizing that the men they know, and many they may never know, have received pleasure, have received sexual gratification, by the images of their rape or abuse. And by recognizing that this could be happening at any moment in the day." (TR 324). Additionally, she noted that a victim's feelings of self-blame might increase if they were smiling in the images, which many offenders insist they do so that collectors can deny the wrongfulness of the abuse. (TR 324–25). Ms. Howley explained that victims suffer feelings of powerlessness because they can never put an end to the abuse because there is no way to guarantee that all the images of their abuse can be found and destroyed. (TR 325).

Ms. Howley noted that the creation, trading, and viewing of child sexual abuse images impacts not only the individual victim, but others as well, "particularly the nonoffending parent of the victim." (TR 325). She explained that the effects on others includes "blaming themselves for not discovering the abuse; not knowing how to help their child cope with the psychological and other effects; [and] being powerless to put an end to the circulation of the images." (TR 325–26).

Ms. Howley, on behalf of the Victims Advisory Group ("VAG") attempts to answer some of the questions posed by the Commission. (TR 326). She stated that the VAG cannot speak to the

typology of offenders, but she noted that "all offenses involving the creation, distribution, and collection of child sexual abuse images are harmful, whether or not they are coupled with a hands-on offenses, because they all work to normalize the sexual abuse of children." (TR 326). She indicated that the VAG agrees that those images that depict violence or in some way dehumanizes the child should be dealt with more severely. (TR 326–27). Ms. Howley suggested that "[i]t would also be useful to consider indications that an offender specifically sought such images, indicated by requests for such images, or the number of such images in a collection." (TR 327). She stated that the number of images is relevant because it reflects the number of victims harmed, and "the number of images of a particular victim may be relevant because victims may feel more distressed to know that an offender had more than one image of them." (TR 327). Ms. Howley noted that "the mere volume of images no longer connoted the same intentionality that it once did when images were traded through the mail. So other factors may be important . . . such as the number of times images were collected; the span of time over which images were collected; the extent to which the images were catalogued; anything that indicates an offender's real intentionality and involvement with this large collection of images." (TR 327–28).

Ms. Howley stated that with regard to the volume of distribution, "victims note that any distribution is harmful because even one distribution opens the door to further distribution." (TR 328). She posited that "other factors that relate to the degree of distribution may be relevant, including the extent to which the offender took deliberate actions to facilitate distribution such as taking steps to provide easier access to specific images in his collection; the frequency of distribution; the span of time over which images were distributed; and whether images were intentionally distributed widely." (TR 328). In examining the form of distribution, Ms. Howley suggested that "courts might consider whether the images were made publicly available, which potentially increases access to or exposure to child abuse images beyond an established community of perpetrators; whether the images were shared with minors, which could indicate grooming of future victims; whether distribution was in response to communication with the recipient and indicated an intention to facilitate or promote other offending or similar factors." (TR 328–39).

Ms. Howley stated that other types of offender behavior that might be relevant include whether child abuse images were shown to another child; whether the participant participated in a chat room or other social group dedicated to child abuse images; whether the offender participated in a chat room that incited additional production of child abuse images or sexual abuse of children, and if after participating or observing such a group, he or she failed to report that activity to the authorities; and whether a producer of child sexual abuse images threatened to expose a victim unless a victim cooperated in the production of additional images. (TR 329–30).

In response to a question about accounting for an offender's past and future sexual dangerousness, Ms. Howley stated that the VAG believed sentencing judges should have as much information as possible about the dangerousness of an offender beyond criminal convictions. (TR 330). She noted that most child sexual abuse remains undetected for reasons well understood, such as "embarrassment and shame; expectations of blame; fear of not being believed; the expectation that disclosure might not help . . . they don't understand having participated in something that was wrong; they might be trying to block out the memories" (TR 330–31). Ms. Howley indicated that "it has been estimated that fewer than ten percent of those

who will acknowledge the abuse state that their abuse was ever reported to authorities." (TR 331). Ms. Howley claimed that "much of the abuse that is reported is not going to result in a conviction due to either lack of evidence, unwillingness of the child's family to undergo the strain of a criminal case, concern about the offender, lack of support for the child and family by other family members, or many other reasons." (TR 331). Additionally, she noted that "many studies out there indicate that many offenders who have been convicted only of possession offenses have in fact committed hands-on offenses that they will self-identify." (TR 331). Ms. Howley concluded that "simply looking at prior convictions does not tell you whether someone has committed a hands-on offense." (TR 331–32). She stated that the VAG would suggest that "anything that can give judges more information about the likelihood that an offender committed a hands-on offense, including arrests, including reports to child protective services—whether substantiated or unsubstantiated." (TR 332). Ms. Howley explained that one unsubstantiated offense does not necessarily mean anything, but when there is a pattern of offenses, that becomes relevant.

With regard to the proper roles of imprisonment and judicial supervision, Ms. Howley believed that "sentences in cases involving child abuse images should reflect the seriousness of these offenses." (TR 332). She asserted that "[e]ven for those convicted only of possession offenses, the fact that an offender intentionally collected such information indicates they received some sort of pleasure or sexual gratification, and they could not have received that benefit if someone else did not abuse the child. So these are child sexual abusers by proxy." (TR 332–33). Ms. Howley suggested that "imprisonment and supervision should also reflect the need to protect the safety of victims and other children." (TR 333).

Ms. Howley stated that the first change the VAG would like to see would have to be made by Congress, "and that would be to amend the restitution statute for child pornography offenses." (TR 333). She indicated that a question has arisen whether the "proximate cause" requirement in 18 U.S. C. § 2259 applies to all of those other costs. (TR 334). Ms. Howley noted that victims' advocates would say "no, it does not even as written, but clarification would be very helpful." (TR 334). Beyond making the statutory change, Ms. Howley stated that the VAG would recommend that Congress set a presumptive amount of restitution due in such cases. (TR 335).

Ms. Howley indicated that the VAG agrees that "sentencing does not appear to be the perfect tool to reduce the market for child sexual images, but it is one of the few tools available." (TR 335–36). She noted that "[t]hrough sentencing we express to society and to the individual and family members harmed that we recognize the seriousness of this offense." (TR 336). Finally, Ms. Howley stated that "the seriousness of crimes involving child sexual abuse images warrants a strong response to offenders." (TR 336).

## VI. Policy Perspectives from the Courts, the Executive Branch, and the Defense Bar

### Northern District of Florida
*Honorable Casey Rodgers, Chief United States District Judge*

Judge Rodgers applauded the Commission for first setting the child pornography guidelines, but stated that there is an "overwhelming percentage of district judges who are dissatisfied with these guidelines, particularly the guideline in the area of possession and receipt." (TR 358). She

stressed that she thought judges would be the first to agree that child sex crimes are "gravely serious offenses" because "in our courtrooms we see and we hear about the unspeakable acts of some of these offenders, and the unimaginable harm that's suffered by the child victims." (TR 358–59). Judge Rodgers posited that judges know from their own experiences that "there are a number of offenses ranging from aggravated child sexual abuse on the one end, to child pornography and obscenity offenses on the other, all representing varying degrees of harm and levels of culpability, and thus judges understand that these sentences, although punitive, [] must be measured and proportionate to the seriousness of the particular offense that is involved." (TR 359).

Judge Rodgers believed that the guidelines in the area of child pornography "have not produced measured and proportionate sentences," and as a result, there have been a "growing number of departures and variances by judges in these cases." (TR 359). She suggested that this is due to "the way that these guidelines have evolved over the past two decades or so with congressional directive after congressional directive, even direct legislative amendment, all aimed at increasing penalties in this area, eliminating judicial flexibility, and often without any evidence-based input from the Commission." (TR 360). In Judge Rodgers's view, the child pornography guidelines had actually "frustrated rather than promoted the goals of proportionality and uniformity that lawmakers sought with the passage of the Sentencing Reform Act." (TR 360).

Judge Rodgers reminded the Commission that it had "heard from countless judges across the country" that "the multiple large-level offense characteristics enhancement in section 2G2.2 have been applied too frequently, and they fail to distinguish harmful conduct." (TR 360). She suggested that "many judges feel that the base offense levels for possession and receipt are set too high." (TR 360). Judge Rodgers believed that in her experience, no one ever gets the benefit of the low end of the statutory range under the guidelines, and no one can, because of the way that the guidelines are currently designed. (TR 361).

Judge Rodgers noted that "Congress has provided a broad statutory range for possession and receipt offenses" which she thought "indicates that Congress contemplated both a wide spectrum of culpable conduct, as well as a broad range of appropriate sentences for these two offenses." (TR 361). On the other hand, Judge Rodgers pointed out that "Congress has issued directives in past amendments to these guidelines that ratchet sentences up to the high end of the statutory range, in effect ignoring the very statutory framework that they gave us judges to work with." (TR 361–62). Judge Rodgers claimed that "Congress insists that judges should not be departing and varying from [§]2G2.2," but she insists that "this guideline, is completely at odds with the Sentencing Reform Act." (TR 362). She stated that the Sentencing Reform Act requires judges to consider other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant, but she stated that "[t]his is impossible to do under [§]2G2.2 which in many cases completely removes even criminal history from the sentencing equation." (TR 362). Judge Rodgers suggested that this "irreconcilable conflict" is "actually driving the high rates of departure and variances." (TR 362). She noted that this "occurs as judges struggle to impose sentences that are just and reasonable for the offenders who stand before them." (TR 362).

Judge Rodgers was provided with statistics of her district from the probation office. (TR 363). She asserted that the filings of child pornography cases in the Northern District of Florida "have

consistently been above the national average," and "in the past two years, they were more than double the national average." (TR 363). She indicated that in her district, "the statistical profile for the typical possessor and receiver of child pornography is nearly identical for those two offenders." (TR 364). Judge Rodgers noted that "100 percent of the offenders in our cases are white males; 38 percent are between the ages of 35 and 45; 90 percent were employed at the time of the commission of the offense; a majority are educated, having graduated either from high school or in many instances college; and over 80 percent have little or no criminal history." (TR 364). In terms of frequency of the offense characteristics in receipt and possession cases, Judge Rodgers stated that "[i]n 90 percent of the cases the. . . two levels for use of a computer is applied; 100 percent of receipt cases . . . and 46 percent of possession cases, the two levels for material involving a prepubescent child is applied; 80 percent of receipt cases, and 61 percent of possession cases, the four levels for sadistic, masochistic, or violent conduct is applied. And in more than 80 percent of possession and receipt cases, the 5-level increase for over 600 images from the image table" is applied. (TR 364–65). Judge Rodgers noted that she often sees numbers that "extend well beyond the image table," frequently spanning "from the range of 1,000 to 100,000 images." (TR 365). She believed that "the impact of these four offense characteristics, which again apply in the majority of these cases, creates . . . a serious imbalance, unlike anything else that we see in the guideline." (TR 365).

Judge Rodgers stated that in her district, "not one person charged or convicted of receipt and sentenced for receipt in the seven years from 2004 to 2011, had a guideline range that included the mandatory minimum. All began well above it." (TR 365). She noted that this is "despite the fact that in receipt cases" in the Northern District of Florida, "85 percent of those offenders were Criminal History Category I." (TR 365–66). Judge Rodgers believed that "[t]his imbalance has also created a problem of proportionality within the guidelines as a whole." (TR 366).

Judge Rodgers noted that there are "crimes involving similar yet arguably more egregious conduct that carry lower ranges." (TR 366). For example, she stated that "in section 2A3.2, which is the guideline for Criminal Sexual Abuse of a Minor Under the Age of Sixteen, the guideline range is 51 to 63 months for a first-time offender," and she claimed that "[t]hat's after applying offense enhancements and before adjusting for acceptance." (TR 366). Additionally, Judge Rodgers asserted that "a first-time offender who uses a computer to misrepresent his identity to persuade a minor to participate in sexual conduct scores out at 27 to 33 months" under §2A3.3. (TR 366). She stated that the same calculation for a first-time offender under §2G2.2 yields a range of 108 to 130 months for possession and 135 to 168 months for receipt. (TR 366).

Judge Rodgers asserted that "these unwanted sentencing disparities not only frustrate judges, they erode the public's confidence in the fair administration of justice." (TR 367). She suggested that "a complete restructuring of the child pornography guideline is needed" and recommends that the Commission "consider starting by separating out receipt and possession from trafficking." (TR 367). Judge Rodgers believed that "[r]eceipt is, by nature, more akin to possession and in fact, as the Commission has acknowledged, it is a logical predicate to possession." (TR 367).

Judge Rodgers suggested that "[p]ossession and receipt could be separated from the trafficking guideline, and a downward departure could be applied, or adjustment could be applied for possession cases in those small, very small number of cases that include . . . simple possession."

(TR 367–68). She asserted that "[s]eparating receipt and possession from the trafficking guideline would also permit the Commission to construct a set of offense characteristics that are more finely tuned to the actual facts of receipt and possession cases" that judges see. (TR 368). Judge Rodgers noted that there is a "wide range of culpable conduct in child pornography offenses, even among receipt and possession offenders that should be incorporated into the offense characteristics." (TR 368).

Judge Rodgers described distinctions she has seen in her own possession and receipt cases over the years: the lengths to which an offender has gone to obtain material; using Internet message boards and chat rooms; paying to obtain access to member-only websites, or to join files or peer-sharing networks; using various payment methods or layers of transactions to make the purchase appear legitimate; obtaining material from foreign countries; and using technology to execute and conceal the offense. (TR 368–69). Judge Rodgers suggested that these types of conduct "are more reflective of possession and receipt offenses, and thus they paint a more realistic picture of the increasingly harmful conduct in those cases, as opposed to the currently overly broad enhancements that are much more relevant [she thought] to production, advertisement, and in many instances trafficking or distribution." (TR 370).

In separating out the possession and receipt cases from trafficking, Judge Rodgers urged the Commission "to promulgate base offense levels for these offense[s] that are independent of the mandatory minimum for receipt." (TR 370). Judge Rodgers believed that "[t]ethering the base offense levels to the mandatory minimum, especially for possession offenses to which it doesn't apply, has . . . contributed to this problem of disproportionate ranges." (TR 370).

Judge Rodgers also urged the Commission to seek repeal of the mandatory minimum sentence for receipt offenders because "there does not appear to be any meaningful distinction between receipt or possession, yet the 60-month mandatory minimum applies to one and not the other." (TR 370). Judge Rodgers asserted that "because of the mandatory minimum, we have widely disparate charging practices for what in many cases is essentially the same conduct." (TR 371). She referred to drug users and noted that "although that individual is still in the chain of culpability and responsible for creating demand in the market, is not subject to a mandatory minimum." (TR 371). As an alternative if Congress is not amenable to repealing the mandatory minimum sentence with regard to receipt, Judge Rodgers urged the Commission "to recommend repeal of the constitutionally imposed restrictions on departures and to recommend that Congress provide a safety valve" for receipt and possession offenders. (TR 371). Judge Rodgers suggested that allowing more guidelines-based departures "will promote uniformity by giving judges much-needed flexibility in fashioning appropriate sentences." (TR 371).

"Regarding the offender side of the equation and the need to protect the public from further crimes of future crimes of these offenders," Judge Rodgers asked the Commission "to consult the science." (TR 372). She stated that this would be to determine "whether there is a reliable measure of the risk of dangerousness for child pornography offenders, particularly those involved in the viewing of these images." (TR 372). Judge Rodgers indicated that the "issue of dangerousness and the judge's need to protect the public, indeed protect our children, of future crimes by sex offenders" is what keeps many judges awake at night. (TR 372). She stressed that "we simply cannot lump everyone together" and "assume that everyone charged with a sex offense poses the same level of risk, and therefore must be taken out of society for lengthy

periods of time, or supervised for life." (TR 372). Judge Rodgers stated that judges need "reliable, evidence-based factors to inform [them] of the risk posed by these offenders, including the likelihood that they will engage in a contact offense," and she thought further study on this is imperative. (TR 372–73).

Judge Rodgers concluded by noting that no one, and certainly not her, "is suggesting that these defendants do not deserve to be punished," but stated that "these sentences must be proportionate" to the seriousness of the offenses. (TR 373). She stated that "we must also take into account the actual risk that is posed by the particular defendant who stands before us in the courtroom." (TR 373).

**United States Department of Justice**

***Francey Hakes, Nat'l Coordinator Child Exploitation Prevention and Interdiction***

Ms. Hakes explained that she is charged with overseeing the Department of Justice's efforts with respect to child exploitation, and they have recently formulated and are in the process of implementing the first ever national strategy for child exploitation prevention and interdiction. (TR 375). She stated that in that national strategy, "the Department for the first time ever compiled a lot of data, information, and interviews with prosecutors, investigators, and social scientists in what was for us the first-ever threat assessment of the threat that these kinds of crimes pose to the children of our country." (TR 376). Additionally, Ms. Hakes noted that the strategy contained a "review of all of the efforts that are currently ongoing inside the Department of Justice to fight against these crimes." (TR 376). She stated that the strategy also sets out certain goals and priorities for the Department to accomplish, including "enhanced collaboration and cooperation among all of our partners, like the National Center for Missing and Exploited Children, the Internet Crimes Against Children Task Forces, . . . the FBI, our global partners, all of our nongovernmental partners like PROTECT and other child advocacy organizations." (TR 376).

Ms. Hakes stated that one of the things that prosecutors and policymakers at the Department of Justice keep in mind are the words from the victims. (TR 378). She believed that this "is specifically why the Department of Justice believed that these cases merit serious sentences." (TR 378). Ms. Hakes asserted that the Department faces "hundreds of thousands, millions of images of these sexual victimization of children, and children whose eyes are begging us to come and rescue them." (TR 379).

Ms. Hakes alleged that she has seen a "dramatic increase in the absolute horrific nature of these images" in the last yen years. (TR 379). She asserted that it is "beyond the imagination of most of us what these children are experiencing." (TR 379). Additionally, Ms. Hakes noted that infants and toddlers are especially difficult to locate because they are so young. (TR 379–80).

Ms. Hakes argued that sentencing is about many things, and while it is about dangerousness, it is also about punishment. (TR 380–81). She noted that the harm to the victims "is really simply immeasurable." (TR 381). Ms. Hakes pointed out that people have questioned the notification of victims by suggesting that the Department of Justice or law enforcement is victimizing the